IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROSEMARIE MAHONE,         )
        )
        Plaintiff,    )
        )
        v.    )    Civil Action No. 06-628
        )
UNIVERSITY OF PITTSBURGH    )    Judge Conti
MEDICAL CENTER,    )    Magistrate Judge Hay
        )
        Defendant.    )

REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is respectfully recommended that Defendant's Motion for Summary Judgment [Doc. No. 21] be granted, and that Plaintiff's Motion for Denial of Defendant's Request for Summary Judgment [Doc. No. 26] be denied.

II.    REPORT

Plaintiff, Rosemarie Mahone ("plaintiff"), commenced this action under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951, et seq., alleging that defendant University of Pittsburgh Medical Center ("UPMC" or "defendant") discriminated against her because of her race.

The record demonstrates that plaintiff began working for UPMC in 1995 on a temporary basis in home care and was transferred to same-day surgery in Montefiore Hospital in 1997 where, according to plaintiff, she was classified as a Clinical Nurse III.  Mahone Dep., pp. 20-22 (Doc. 23-3 to 23-5).  Plaintiff was later transferred to the resource unit and, after about a year, realized that she was classified as a Clinical Nurse II on her pay vouchers and notified Debbie Santorelli ("Santorelli"), the director of the resource unit, of the alleged error.  Mahone

Dep., pp. 23-25. Plaintiff testified that although she went back to Santorelli several times the problem was not corrected and felt that "maybe [Santorelli] wasn't allowed to correct it" because she had to go through the nurse recruiter, Judy Jim ("Jim"). Plaintiff also testified that she did not feel as though Santorelli harassed her or was hostile toward her but, rather, just ignored her and that after several months she contacted Jim about the problem. Mahone Dep., pp. 25, 38. Jim apparently informed plaintiff that she was properly classified as a Nurse II and that the only reason she had been given a Nurse III classification before was probably because there were no Nurse II forms available when she had her semi-annual performance review test. Mahone Dep., p. 26.

At some point thereafter, plaintiff contacted Dee Stairs ("Stairs"), who had replaced Santorelli as the resource unit director, about plaintiff's classification but without satisfaction. Mahone Dep., pp. 27-28. As with Santorelli, plaintiff testified that her only complaint regarding Stairs was Stairs' failure to respond to her regarding her classification. Mahone Dep., p. 90. As such, on August 24, 2000, plaintiff wrote a letter to Linda Michaels ("Michaels") in human resources about the problem. Mahone Dep., pp. 39-40 & Exh. 5. Plaintiff testified that after giving her all the files and documentation relevant to the issue, Michaels told her that she couldn't do anything else to correct the problem and that it had to be taken care of by the resource unit. Mahone Dep., pp. 31, 40.

On December 7, 2000, plaintiff wrote a letter to Michael Payne ("Payne") in human resources regarding the issue and was told that her classification would be changed if plaintiff agreed to complete a community service project. Mahone Dep., p. 28 & Exh. 6. Plaintiff was able to provide documentation regarding her past community involvement and her status was then changed. Mahone Dep., p. 29. Although plaintiff's status to a Clinical Nurse III

was not changed until December of 2000, it appears that the change was somehow backdated and reflected in a letter from Jim dated September 28, 2000.  Mahone Dep., pp. 35-36, 85, 128 & Exh. 9.  Plaintiff nevertheless testified that she did not know who, if anyone, was responsible for the alleged misclassification allowing that it could have been a computer error or paper work error and that she did not lose any pay as a result.  Mahone Dep., pp. 31-32.

In the interim, it appears that plaintiff transferred to the cardiothoracic unit which was directed by Melanie Shatzer ("Shatzer").  Mahone Dep., pp. 44-45, 90.  Sometime in November of 2000, plaintiff was called by Shatzer on plaintiff's day off and asked to come in to discuss a problem with a patient that, according to plaintiff, had already been resolved.  Plaintiff testified that she agreed to come in but told Shatzer she was giving two weeks notice.  When Shatzer asked for plaintiff's resignation, plaintiff told her she meant only that she was resigning from the cardiothoracic unit and returning to the resource unit and not that she was resigning altogether.   Mahone Dep., pp. 45-47, 50, 92-94.  Plaintiff reiterated as much in a subsequent meeting with Shatzer and Sue Hamilton ("Hamilton"), who also worked in human resources. Mahone Dep., pp. 45-46, 97-98.

Plaintiff, in fact, returned to the resource unit in November of 2000 and worked under director Helen Stengle on unit 10S.  Mahone Dep., pp. 45, 49-51.  Although plaintiff testified that Jim had directed that plaintiff be restricted to working on 10S, she also testified that Michaels had indicated in a letter that, as a nurse recruiter, Jim could not restrict where plaintiff worked.  Mahone Dep., pp. 45, 49, 50, 51, 90, 99.  Nevertheless, it was plaintiff's testimony that she has not had any interaction with Santorelli, Jim, Stairs, Shatzer or Hamilton since 2000, and that the last interaction she had with Stengle was early 2001 at the latest.  Mahone Dep., pp. 25, 52, 85-88, 91, 98-100.

The record appears devoid of any other incidents until early 2004, when plaintiff was working in the renal transplant unit on a temporary four or five month assignment under directors Debbie Good ("Good") and Carolyn Hartner ("Hartner").  Mahone Dep., pp. 101-103, 107, 110.[1]  After three or four months, plaintiff applied for a permanent position that had opened up and an interview was scheduled.  On the scheduled date, however, no one showed up. Mahone Dep., pp. 103-04.  Plaintiff e-mailed Shannon Flynn, the secretary/coordinator for Good and Hartner and, although another interview was eventually rescheduled, it did not take place until November 11, 2004, following which, another applicant was chosen for the position based on the candidate's qualifications.  Mahone Dep., pp. 103-04; Hartner Aff. ¶¶ 4, 5, 6 (Doc. 23-9). Plaintiff nevertheless testified that her complaint with Good and Hartner was not her failure to get the position but, rather, the fact that they failed to respond to her or communicate with her about her application and interview even though they worked together every day.  Mahone Dep., pp. 103, 104, 107-110.

In the interim, apparently sometime in March of 2004, plaintiff was transferred through Vital Staffing to the same-day surgery unit 6G at Presbyterian Hospital where she was supervised by the unit director, Elaine Farmer ("Farmer").  Mahone Dep., pp. 53-54.  Plaintiff remained on unit 6G until April 6, 2004, during which time, according to plaintiff, Farmer chastised and embarrassed her on several occasions.  Mahone Dep., pp. 53, 72, 80; PHRC Complaint ¶¶ 10-12 (Doc. 1).  Specifically, plaintiff testified that Farmer called her into her office, in view of everyone at the nurses station, because a white secretary had complained that

---

[1]     Plaintiff was given the assignment through Vital Staffing which is an agency within UPMC that provides nurses to UPMC facilities that have a staffing shortage.  Plaintiff began receiving assignments through Vital Staffing in June of 2001.  Bernthaler Aff. ¶¶ 2, 4 (Doc. 23-8).

4

plaintiff used a staple rather than a paperclip to secure a patient's medical records insinuating that plaintiff was too lazy to go and get a paperclip.  Mahone Dep., pp. 55-56, 58-59.  As a result, plaintiff wrote a letter to Bruce Nagle, the Vice President of Human Resources for UPMC, memorializing that and another previous incident with Farmer.  Mahone Dep., pp. 132-34 & Exh. 7.

Plaintiff also claims that on April 6th, Farmer allegedly blamed and berated her for a delay in getting a patient x-rayed and discharged which plaintiff testified was the fault of the night secretary.  Mahone Dep., pp. 50-63.  Plaintiff also testified that on that same day, Farmer interrupted her while she was using the computer to inform plaintiff that one of her patients needed to be taken off a stretcher and that when she entered the patient's room there were four other staff members capable of performing that function standing around the bed waiting for her. Mahone Dep., pp. 65-68.  A third incident occurred on April 6th in which Farmer's secretary apparently became upset with plaintiff over something "benign" and when everyone began to laugh the secretary ran into Farmer's office.  Mahone Dep., pp. 70-71.  Plaintiff testified that because she knew that she "wasn't going to survive this," she asked Farmer to take her off the schedule indicating that she wanted to transfer to the night shift.  Mahone Dep., pp. 70, 72. Plaintiff also indicated that although she was overburdened with work and other nurses were just sitting there, she never spoke to Farmer about it stating that Farmer was aware of it and condoned it.  Mahone Dep., pp. 138-39.

Consequently, plaintiff asked Adam Bernthaler ("Bernthaler"), who was a staffing coordinator in Vital Staffing, to be changed to the night shift so she wouldn't have to work with Farmer or her secretary.  Mahone Dep., p. 73-76.  Indeed, it appears that April 6th was plaintiff's last day on same-day surgery and that she never worked nor had a conversation with Farmer

thereafter.  Mahone Dep., pp. 65, 72, 80, 84.   It also appears that Farmer notified Vital Staffing

via e-mail that plaintiff had requested a transfer and provided information about the various

issues she had with plaintiff as had apparently been requested.  Farmer Aff. ¶¶ 2, 3 & Exh. 1.

Plaintiff was subsequently transferred to Gleason Medical Associates where she made the same

hourly rate as she made while working on unit 6G.  Bernthaler Aff. ¶ 6 (Doc. 23-8).  Although

plaintiff testified that Bernthaler told her she couldn't work at either Montefiore or Presbyterian

Hospitals because of Farmer she also testified that Bernthaler simply said that it was probably

better for her to work outside of the university for awhile.  Mahone Dep., pp. 74-76.   Bernthaler

has nevertheless attested to the fact that his decision-making was restricted to finding appropriate

openings for nurses, and that he transferred plaintiff to Gleason Medical Associates because

plaintiff asked to be transferred, Gleason had an appropriate opening and Farmer had sent him an

e-mail regarding the issues described above.  Bernthaler Aff. ¶¶ 3, 5.

       At some point thereafter, it appears that UPMC notified its private duty service

employees, including plaintiff, that they were required to pick up a new handbook and receive

training.  Kissinger Aff. ¶ 6 (Doc. 23-6).  Plaintiff, along with many other employees, missed

multiple deadlines for picking up the new handbook and on June 8, 2004, a letter was issued

terminating their employment for having failed to do so.  Kissinger Aff. ¶ 6; Mahone Dep., p.

139 & Exh. 5.  Although plaintiff testified that she did not know if any white employees were

discharged for failing to pick up a handbook, Angie Kissinger, a human resource recruiter for

UPMC, has attested to the fact that ten of the twenty-five employees who were terminated for

that reason, were Caucasian.  Mahone Dep., p. 168; Kissinger Aff. ¶ 7.  It nevertheless appears

that plaintiff was rehired after she subsequently picked up the handbook.  Mahone Dep., pp. 139-

40.

Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on July 25 or July 26, 2004, which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Mahone Dep., p. 19; Complaint ¶¶ 1, 2; Kissinger Aff. ¶ 4. The instant complaint was filed on May 11, 2006, wherein plaintiff, who at the time was represented by counsel, has merely incorporated the complaint that she filed with the PHRC. Plaintiff has alleged therein that defendant harassed and discriminated against her in 1998 by trying to demote her and in 2004 when her supervisor chastised her and otherwise treated her differently than similarly situated white employees (Count I); that after she complained, she was retaliated against by "being overburdened with a caseload while other nurses sat around doing nothing" (Count II); that she was discharged in July of 2004, because of her race (Count III); and that defendant retaliated against her when she was told that she could no longer work at Montefiore or Presbyterian Hospitals (Count IV). Defendant has now filed a motion for summary judgment arguing that plaintiff's claims revolving around her alleged demotion are barred by the statute of limitations and that she is otherwise unable to prove her claims.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set

7

forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

Defendant first argues that plaintiff's claims of discrimination and harassment which occurred more than 300 days before she filed a charge of discrimination should be dismissed as untimely.  We agree.

Under Title VII a charge of discrimination must be filed with the EEOC within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1). See Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 460-70  (3d Cir. 2001). If, however, the claimant has also initiated a complaint with a parallel state agency, the period for filing the charge with the EEOC is extended to 300 days from the date of the alleged unlawful employment practice.  Id.  Moreover, the period within which to file the administrative complaint is treated as a statute of limitations.  Id. at 470, 472.

Here, it is undisputed that plaintiff filed a complaint with the PHRC sometime in late July, 2004.  Thus, only those claims which occurred within the prior 300 days, or after September 2003, are actionable.  Plaintiff's claim brought at Count I revolving around her alleged demotion to a Clinical Nurse II, however, occurred in 1998 and was resolved by

December of 2000.  Because clearly more than 300 days had passed before plaintiff filed her charge of discrimination with the PHRC her claim relating to her misclassification is barred.

Plaintiff nevertheless suggests that the continuing violation theory applicable to hostile work environment claims applies rendering the claim timely.  Because it appears that plaintiff is unable to demonstrate that her alleged demotion in 1998 was anything but a discrete act of discrimination rather than part of a hostile work environment, the continuing violation theory does not apply and plaintiff's claim remains barred.

Citing to National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) ("Morgan"), in which the United States Supreme Court drew the distinction between discrete acts which must be raised within the requisite limitations period and acts which may be aggregated to make out a hostile work environment claim, the Court of Appeals for the Third Circuit identified termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation as discrete acts of discrimination.  O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006).  The Court also noted that such "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discriminatory act starts a new clock for filing charges alleging that act."  Id., citing Morgan, 536 U.S. at 113.

In contrast, hostile work environment claims involve "repeated conduct" that so permeates the workplace with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment.  Morgan, 536 U.S. at 115-116, quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted).  Under such circumstances, even those acts which occurred outside the statutory time period are

actionable "so long as they are linked in a pattern of actions which continues into the applicable limitations period." O'Connor v. City of Newark, 440 F.3d at 127.

In this case, plaintiff's claim that she was demoted to a Clinical Nurse II in 1998 is not "repeated conduct" and did not permeate plaintiff's day to day work environment with intimidation, ridicule and insult. Rather, it is a single discrete act, just as failing to promote an employee, terminating an employee, denying a transfer, refusing to hire, and wrongfully suspending or disciplining an employee are discrete acts. Moreover, there is more than a three year gap between the time that the alleged misclassification was corrected and the next instance of discrimination of which plaintiff complains, during which she concedes that she had no contact with those allegedly responsible for the error. Indeed, the next instance of alleged discrimination did not occur until early 2004, when plaintiff was working in a different unit under different supervisors. Under these circumstances, plaintiff cannot show that her alleged demotion is actionable as part of an on-going pattern of actions which continued into the applicable limitations period. As such, plaintiff was required to file a charge of discrimination within 300 days of its occurrence and her failure to have done so has rendered her claim here untimely.

Nor does it appear that plaintiff is able to establish her claim that she was subjected to a hostile work environment while working with Farmer in April of 2004.

In order to establish a hostile work environment under Title VII, plaintiff must establish that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir.

10

2005), quoting Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).  In determining whether the conduct at issue is "abusive" or "hostile" courts should look to the totality of  the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Id.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990).

   In the instant case, plaintiff alleges that during the one week that she was under Farmer's supervision Farmer chastised her after a white secretary complained that plaintiff had stapled a patient's medical records together instead of using a paper clip; that Farmer berated her in front of other staff members for a delay in getting a patient x-rayed and discharged; and that Farmer interrupted her while she was using the computer to inform plaintiff that one of her patients needed to be taken off a stretcher when there were four other staff members capable of performing that function available to do so.  Complaint ¶¶ 10-12.

   At the outset, we note that plaintiff has not alleged nor identified any racist comments, written or spoken, that were directed at her and there is nothing about Farmer's actions themselves that are racially charged.  Nor has plaintiff pointed to any evidence that would suggest that Farmer's actions were otherwise racially motivated, that there was otherwise any racial animosity on the unit or that, had plaintiff been white, she would not have been treated in the same manner.  Indeed, plaintiff testified that she is unable to identify any white employee that was treated differently.  Mahone Dep., p. 78.  Thus, while plaintiff may have felt that she was being harassed or treated unfairly, she is unable to demonstrate that it was because of her race and not for some other reason.

Moreover, it does not appear that the three incidents of which plaintiff complains constitute pervasive and regular conduct or that it was severe enough to interfere with her work performance.  Nor has plaintiff argued or presented any evidence that Farmer's conduct affected her ability to do her job.  As such, it appears plaintiff is unable to demonstrate that she was subjected to a hostile work environment and defendant is entitled to summary judgment as to that claim as well.  See Caver v. City of Trenton, 420 F.3d at 262, quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (In evaluating a hostile work environment claim under Title VII "'offhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim.  Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."); Waite v. Blair, Inc., 937 F. Supp. 460, 468 (W.D. Pa. 1995), aff'd without opinion, quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21 ("Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment") (internal quotations and citations omitted).

Defendant also argues that it is entitled to summary judgment on Count III of the complaint wherein plaintiff has alleged that she was discharged in July of 2004 because of her race.

Where, as here, the plaintiff seeks to prove her case through circumstantial evidence, the three-stage shifting burdens of proof developed for employment discrimination cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981); Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994).  Under this standard,

12

plaintiff has the initial burden of demonstrating, by a preponderance of the evidence, a *prima facie* case of discrimination.  Id.  Once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision.  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.), cert. denied, 515 U.S. 1159 (1995).  If the defendant succeeds in articulating such a reason, the burden then shifts back to the plaintiff "who must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination."  Marzano v. Computer Science Corp., supra at 502-03, quoting Texas Department of Community Affairs v. Burdine, supra at 252-53.  At all times, however, the burden of persuasion remains with the plaintiff.  Id. at 503.

Under Title VII, a *prima facie* case will be found in a racial context where plaintiff can demonstrate that: (1) he or she was a member of the protected racial group; (2) he or she was qualified to hold the position; (3) he or she suffered an adverse employment decision; and 4) that similarly situated employees, not of the protected group, were treated more favorably. St. Mary's Honor Center v. Hicks, supra; Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993).  See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995).

Here, defendant does not dispute that plaintiff is a black individual who was qualified for her position or that she was terminated on July 8, 2004, for failing to pick up a new handbook and receive training.  Rather, defendant argues that plaintiff is unable to establish the fourth prong of the *prima facie* case, i.e., that she was treated less favorably than other, non-black employees.  To that end, defendant has presented evidence that twenty-four other employees were also terminated on July 8, 2004, for failing to pick up the handbooks and that ten of them

13

are white.  Kissinger Aff. ¶ 7 & Exh. 1.  Plaintiff does not dispute the fact that white employees were also discharged for failing to pick up the handbook nor has she presented any evidence to support such a theory.  Indeed, plaintiff has submitted along with her brief the same twenty-five termination letters offered by the defendant.[2]  Pl.'s Encl. 27 (Doc. No. 26).  As such, plaintiff is unable to establish a *prima facie* case of discrimination with respect to her brief termination in July of 2004, and defendant is therefore entitled to summary judgment.

Defendant also argues that it is entitled to summary judgment on plaintiff's remaining disparate treatment claims revolving around the alleged restriction imposed on her from working at Montefiore and Presbyterian Hospitals and her application for a renal transplant coordinator position.  Specifically, defendant argues that plaintiff is unable to establish the third prong of a *prima facie* case or that she suffered an adverse employment action in either instance.

To constitute an "adverse employment action" actionable under Title VII the employer's action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  Storey v. Burns Intern. Security Services, 390 F.3d 760, 764 (3d Cir. 2004), quoting Cardenas v. Massey, 269 F.3d at 263.

---

[2]     Plaintiff has seemingly submitted the termination letters to support her belief that white employees were given the opportunity to be rehired when she was not.  Although it appears that some of the letters contain language indicating that the recipient is eligible for rehire and directing them to UPMC's website for current position listings and that plaintiff's letter did not contain that language, it does not negate the fact that other similarly situated white employees were, in fact, terminated for precisely the same reason that plaintiff was terminated.  Nor does it negate the fact that regardless of whether she was apprised of her eligibility to be rehired in the letter, she was, in fact, rehired after she picked up the handbook.  Moreover, plaintiff has not provided any evidence from which it can be determined which, if any, of the employees who received letters containing the cited language were white. Plaintiff's argument, therefore, is unavailing.

In the instant case, the record demonstrates that after the incidents with Farmer while working in same-day surgery, plaintiff asked to be taken off Farmer's schedule indicating that she wanted a transfer.  Mahone Dep., pp. 70, 72.  To that end, plaintiff asked Bernthaler in Vital Staffing for a transfer following which she was, in fact, transferred to Gleason Medical Associates where she made the same hourly rate as she made while working on unit 6G. Bernthaler Aff. ¶ 6 (Doc. 23-8).  Having requested the transfer herself and having received the same compensation when the transfer was effectuated, it is difficult to see how plaintiff suffered an adverse employment action.  See Shramban v. Aetna, 262 F. Supp. 2d 531, 538 (E.D. Pa. 2003), aff'd, 115 Fed. Appx. 578 (3d Cir. 2004) (Finding that a transfer to another project where plaintiff's duties remained substantially the same and her pay was not diminished does not constitute an adverse employment action).  See also Langley v. Merck & Co., 186 Fed. Appx. 258, 261 (3d Cir. 2006) ("[L]ateral transfers and changes of titles and reporting relationships are generally insufficient to constitute adverse employment actions").

In addition, although plaintiff testified that Bernthaler told her she couldn't work at either Montefiore or Presbyterian Hospitals because of Farmer, she also testified that Bernthaler merely told her and that it was probably better for her to work outside of the university for awhile.  Mahone Dep., 74, 76.  Moreover, in the e-mail from Bernthaler that plaintiff refers to as demonstrating that she was restricted from working at either Montefiore or Presbyterian Hospitals, Bernthaler states that it was plaintiff who mentioned to him that "she would like to stay away from hospital work for awhile due to the recent controversy," and that she suggested work with Private Duty.  Pl.'s Encl. 24.  Further, Bernthaler has attested to the fact that his decision-making was restricted to finding appropriate openings for nurses, and that he transferred plaintiff to Gleason Medical Associates because plaintiff asked to be transferred and

15

Gleason had an appropriate opening.  Bernthaler Aff. ¶¶ 3, 5.  Under these circumstances, it does not appear that a reasonable fact finder could conclude plaintiff suffered an adverse employment action at the hands of defendant.[3]

Nor does it appear that plaintiff suffered an adverse employment action when defendant allegedly "ignored" her application for a renal transplant coordinator position in early 2004.  According to plaintiff's deposition testimony, her specific complaint is that no one showed up for her initial interview and that Good and Hartner did not take note of or discuss her application and interview with her even though they worked together everyday.  Mahone Dep., pp. 107-110.  Whether or not Good and Hartner discussed plaintiff's application with her while interacting during the work day, however, does not negate the fact that plaintiff's interview was rescheduled and that she was, in fact, interviewed for the position -- neither of which plaintiff disputes.  See Hartner Aff. ¶¶ 4, 5.  Moreover, the mere fact that her initial interview was postponed does not appear to have had any impact on her compensation, terms, conditions, or privileges of employment and, thus cannot be considered an adverse employment action.[4]  It therefore appears that plaintiff is unable to demonstrate a *prima facie* case of discrimination on her remaining claims brought at Count I of the complaint and defendant is entitled to summary judgment on those claims as well.

---

[3]     We also note that to the extent plaintiff has suggested that the restriction resulted in her being denied employment opportunities, she has not identified what those opportunities may have been, who was placed in the positions, or pointed to any evidence which would suggest she was qualified for those opportunities.

[4]     Notably, plaintiff has not alleged that UPMC discriminated against her by failing to actually hire her for the position.  Nor does there appear to be an issue in that regard as defendant has presented evidence that another candidate was chosen because of that individual's qualifications which plaintiff does not dispute.  See Hartner Aff. ¶ 6.

Finally, defendant argues that plaintiff is also unable to establish a *prima facie* case of retaliation and, thus, it is entitled to summary judgment on those claims brought at Counts II and IV of the complaint.

Title VII prohibits an employer from retaliating against an employee who files a charge of discrimination or otherwise opposes an unlawful employment practice.  Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d 130, 134 (3d Cir. 2006).  In order to establish a prima facie case of retaliation a plaintiff must show that: (1) the plaintiff engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between plaintiff's participation in the protected activity and the employer's adverse action.  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).

Here, plaintiff contends that she engaged in protected activity when she complained of racial discrimination in letters written to Michaels in 1998, Payne in 2000 and Nagle in 2004.  Complaint ¶¶ 22, 23, 25; Mahone Dep., pp. 35, 39-40, 85, 132-33 & Exhs. 5, 6, 7.  In the 1998 letter to Michaels, however, although plaintiff voices her complaints about being misclassified as a Clinical Nurse II, it is devoid of any reference to racial discrimination or any other unlawful employment practice and, thus, does not qualify as protected activity.  See Mahone Dep. Exh. 5.  See also Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d at 135 (To establish protected activity the plaintiff must identify the employer and the unlawful practice.); Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995) (Finding that the plaintiff's letter to the Human Resource Department was not protected activity where plaintiff did not specifically complain of age discrimination but stated only that he believed the position was given to a less qualified individual).

Similarly, although plaintiff states in her letter to Payne dated December 7, 2000, that she felt compelled to complain about what she categorized as "two years of discrimination, differential treatment, and most currently, harrassment [sic] and denial of the equal opportunity for gainful employment," the letter does nothing more that recite the circumstances surrounding two incidents where her supervisor spoke to her about patients' orders that were not properly documented and which apparently prompted plaintiff to ask for a transfer.  Although it is clear that plaintiff believes she was treated unfairly, she makes no reference whatsoever to race or to other non-protected employees who may have been treated differently.  Moreover, although she states that she feels as though she is being denied equal opportunity for gainful employment because Jim in Human Resources told her she could only work on 10S, she attributes it simply to Jim's animosity toward her without regard to race and nevertheless states that Hamilton in human resources told her that it was not true.  Mahone Dep., Exh. 6.  The mere fact that plaintiff complained because she was reprimanded by her supervisor on two occasions and felt as though someone from human resources showed animosity toward her does not, in our view, raise the issue of race discrimination or constitute protected activity.  See Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d at 135, citing Barber v. CSX Distribution Services, 68 F.3d at 702 (Finding that the plaintiff's letter did not constitute protected activity where it neither explicitly or implicitly alleged that a protected characteristic was the basis for the adverse employment action).

Although defendant argues that the letter plaintiff wrote to Nagel in March of 2004 does not constitute protected activity either since it does not set forth a specific complaint of a discriminatory practice, we need not decide that issue here as it is nevertheless evident that plaintiff is unable to establish the third prong of the *prima facie* case, i.e., that there is a causal

connection between her having written the letter and any adverse employment action she claims to have suffered.[5]  Indeed, plaintiff has alleged that defendant retaliated against her by prohibiting her from working at Montefiore and Presbyterian Hospitals and by overburdening her with a caseload "while other nurses sat around doing nothing."  Complaint ¶¶ 27, 39.  Both of these actions plaintiff attributes to Farmer.  Id.  Farmer, however, has attested to the fact that when these allegedly retaliatory acts took place in April of 2004, she was unaware that plaintiff had written a letter to Nagle.  Farmer Aff. ¶ 4.  Defendant has also represented, and plaintiff does not dispute, that Farmer did not become aware of plaintiff's letter to Nagle until October of 2004, which was well after the retaliatory acts of which plaintiff complains took place.  See Def.'s Statement of Undisputed Material Facts, ¶ 65.  As such, it does not appear that there is any evidence of record to support a finding that Farmer acted with a retaliatory motive which plaintiff has seemingly conceded.  See Doc. 25, ¶ 50.  See also McGorrian v. EMSA, 85 Fed. Appx. 1, 3 (3d Cir. 2003) (Finding no causal connection between the plaintiff's protected activity and the defendant's failure to rehire her where the individual in charge of hiring was unaware at the time of the plaintiff's charge of discrimination).  As such, plaintiff is unable to establish a *prima facie*

---

[5]       We note, however, that although plaintiff does not expressly complain of racial discrimination in the letter she nevertheless references the fact that she is an African- American and that she has experienced "horrific obstacles to job development" as well as her "experience with racial targeting and discrimination" which has "continued unabated for 9 years."  Mahone Dep., Exh. 7.  Although the letter largely revolves around two incidents in which Farmer called her into her office, the first being on March 23, 2004, to question her about a tube of medication that had exploded in the carrier and the second, on March 24th to confront her when the secretary complained because plaintiff had not used a paperclip to adhere a patient's records together, plaintiff also states that it was her impression that Farmer expected her to clean out the carrier which she believed reflected Farmer's assumption that minorities should be relegated to the status of housekeeper.  These assertions certainly imply that plaintiff was being harassed because of her race.

case of retaliation and defendant is therefore entitled to summary judgment on those claims as well.[6]

For these reasons, it is recommended that Defendant's Motion for Summary Judgment [Doc. No. 21] be granted, and that Plaintiff's Motion for Denial of Defendant's Request for Summary Judgment [Doc. No. 26] be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objection shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  Amy Reynolds Hay
United States Magistrate Judge

Dated:   16 July, 2007

---

[6]     We also note that to the extent that plaintiff has suggested that Bernthaler made the decision to prohibit her from working at Presbyterian and Montefiore Hospitals, Bernthaler has also submitted an affidavit, which remains uncontroverted by plaintiff, that he was not a supervisor in Vital Staffing and that any decision making on his part was restricted to finding appropriate openings for nurses.  Bernthaler Aff. ¶ 3.  See Sherrod v. Philadelphia Gas Works, 209 F. Supp. 2d 443, 450 (E.D. Pa. 2002), aff'd, 57 Fed. Appx. 68 (3d Cir. 2003), quoting Burlington Inductries, Inc. v. Ellerth, 524 U.S. 742, 762 (1998) (An adverse employment action "requires an official act taken by a supervisor within the company who has the power to make economic decisions affecting employees under his or her control").  Moreover, as previously discussed, the e-mail from Bernthaler to which plaintiff refers as evidencing the restriction of which she complains states that it was the plaintiff herself who indicated that she wanted to stay away from hospital work for awhile and does not otherwise impose any limitation on plaintiff's work status.  See Pl.'s Encl. 24.

cc:     Rosemarie Mahone
        704 Whitney Avenue
        Pittsburgh, PA 15221

        Brian D. Balonick, Esquire
        Terrence H. Murphy, Esquire
        by Notice of Electronic Filing